UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

LIONEL MILLER,                        )
                                      )
        Plaintiff,                    )
                                      )
    vs.                               )        Case No. 4:12CV1383 CDP
                                      )
CAROLYN W. COLVIN,[1]                 )
Acting Commissioner of Social Security, )
                                      )
        Defendant.                    )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the

Commissioner's final decision denying Lionel Miller's application for

supplemental security income benefits under Title XVI of the Social Security Act,

42 U.S.C. §§ 1381 *et seq*.  Miller claims he is disabled because he suffers from

paranoid schizophrenia and borderline intellectual functioning.  After a hearing,

the Administrative Law Judge concluded that Miller was not disabled.  Because I

find that the ALJ's determination of Miller's residual functional capacity was not

based on substantial evidence, including "some medical evidence" as required, I

will remand.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.
As such, she is substituted for Michal J. Astrue as the defendant in this lawsuit.  Fed. R. Civ. P.
25(d).

# I.   Procedural History

Miller filed his application for supplemental security income benefits on March 20, 2009.  He initially alleged an onset date of May 1, 2001, but later amended that date to January 11, 2010.  When his application was denied, he requested a hearing before an administrative law judge.  He then appeared, with counsel, at an administrative hearing on April 28, 2011.  Miller and a vocational expert testified at the hearing.  After the ALJ questioned Miller's counsel, Miller amended his alleged onset date for a second time, to March 26, 2010.

After the hearing, the ALJ denied Miller's application, and he appealed to the Appeals Council.  On June 8, 2012, the Council denied his request for review. The ALJ's decision thereby became the final decision of the Commissioner. *Van Vickle v. Astrue*, 539 F.3d 825, 828 (8th Cir. 2008).

Miller now appeals to this court.  He argues that the ALJ erred by: (1) assigning too little weight to the opinions of his treating psychiatrists; (2) failing to consider how Miller's structured environment reduced his schizophrenia symptoms; (3) failing to sufficiently analyze Miller's borderline intellectual functioning or order a consultative exam; (4) failing to account for all functional limitations caused by schizophrenia when determining Miller's residual functional capacity; (5) failing to describe how the evidence supported her RFC

determination; and (6) determining that Miller had an RFC not supported by substantial evidence.

## II. <u>Evidence Before the Administrative Law Judge</u>

Miller eventually amended his alleged onset date to March 26, 2010.[2] Because his initial alleged onset date was in 2001, he submitted medical records and other evidence relating to the period before March 26, 2010. I have summarized that evidence because it may be relevant "in helping to elucidate" Miller's conditions. *See Pyland v. Apfel*, 149 F.3d 873, 877 (8th Cir. 1998).

### *Medical Records*

Miller was incarcerated at Farmington Correctional Center from 2007 until January 2010. While he was in prison, he participated in groups for anger management, substance abuse treatment, and art therapy multiple times per week. He also attended a group aimed at helping him transition to life outside prison.

Additionally, Miller met with a mental health provider at least once per month throughout 2008 and 2009. The providers assigned a GAF score between 59 and 65 at each visit.[3] At a visit to psychiatrist Scott Jones on January 30, 2009,

---

[2] See *supra*, p. 17 for a discussion of why Miller amended his alleged onset date.

[3] The GAF is a numeric scale ranging from zero to one hundred used to rate social, occupational, and psychological functioning "on a hypothetical continuum of mental health-illness." *Diagnostic & Statistical Manual of Mental Disorders*, 32 (4th ed. Am. Psychiatric Ass'n 1994) [hereinafter DSM–IV]. A GAF of 51 to 60 indicates the individual has "[m]oderate symptoms . . . or moderate difficulty in social, occupational, or school functioning . . . ." *Id.* A GAF of 61 to 70 indicates "some difficulty in social, occupational, or school functioning, but generally functioning pretty well." *Id.*

Miller reported sleeping too much and intermittent low energy, plus mild difficulty concentrating.  But at most visits to his mental health providers, Miller had no complaints and did not report any symptoms.  According to treatment records from a visit on November 5, 2008, psychiatrist Jones wrote, "This patient does not report any difficulties virtually at every visit.  [H]e likely has [borderline intellectual functioning][4] and this might make it difficult for him to understand that he should be evaluated medically."

Throughout the time he was incarcerated, Miller was taking Risperdal.[5] Providers reported that he was compliant with his medication.[6]  At the January 30, 2009 visit, Dr. Jones wrote that he would "try to find the lowest good maintenance dose" of Risperdal.  He continued, "[Miller] has done very well for the last 16 months, and merits an opportunity to take less" medication and then be reevaluated.  Dr. Jones eventually decreased Miller's dosage to two milligrams daily, from three milligrams daily.

That same month, Miller saw case manager Angela Bowman, who reported that Miller was attending classes but did "not believe he [was] smart enough to learn and obtain his GED."

---

[4]   Borderline intellectual functioning is defined as an IQ score within the 71–84 range.  *Hutsell v. Massanari*, 259 F.3d 707, 709 n.3 (8th Cir. 2001); *see also* DSM-IV, 39–40, 684.

[5]   Risperdal is a psychotropic drug indicated for the treatment of schizophrenia and bipolar disorder. *See Physician's Desk Reference*, 1676–77 (61st ed. 2007).

[6]   It appears that Miller was involuntarily medicated but was permitted to ingest his medication independently.  (*See* Tr., p. 241.)

At a visit to psychiatrist Stefan Nawab on February 25, 2009, Miller reported "no complaints" and stated that he was "stable on his Risperdal." According to Dr. Nawab's notes, Miller reported that he had not heard voices or been seriously paranoid since 1993. Dr. Nawab wrote that Miller was "currently tolerating [his] medication without any complaints of muscle dystonias or spasms." Dr. Nawab did a mental status examination and found that Miller's mood was euthymic, his attention, concentration, judgment, and insight were fair, and his thought process was linear and goal-directed. Dr. Nawab wrote that Miller's affect was "somewhat constricted."

Miller saw counselor Bowman on March 18, 2009. At the time, his primary goal was to maintain a stable mood. Bowman wrote that Miller was "achieving this by medication compliance, groups, work, school, and watching television to relax." According to Bowman's notes, Miller was employed as a dorm maintenance worker, which he later described as a job requiring about two or three hours daily.

At a visit to nurse Arletta Groom in April 2009, Miller showed good grooming and hygiene, maintained good eye contact, and spoke at a normal rate. Groom wrote that Miller "[got] along with staff and socialize[d] with select peers." He denied suicidal or homicidal ideations and denied any hallucinations. He also denied experiencing anger, anxiety, or depression, and he reported that he was able

to feel interest and pleasure in life.  However, Groom noted that Miller was "rocking back and forth in chair and wringing hands at times during exchange."

Miller had several follow-up appointments in April and May 2009 at which providers noted he was "stable."  At a visit on May 28, 2009, Dr. Jones wrote that Miller denied any difficulties with attention, concentration, memory, or executive functioning but did "appear to have some decrease in cognition."  Nonetheless, he noted that Miller was fully oriented and exhibited no abnormal or confused behaviors.  Dr. Jones assigned Miller a GAF of 63.

For the remainder of 2009, Miller consistently kept his appointments with his mental health providers and reported no complaints.  When asked about his mood, he rated it between an 8 and a 10 out of 10 every time.  He reported normal sleep and appetite, and his mental status examinations revealed no abnormal behaviors.  In August 2009, Miller received a conduct violation, for keeping a "debt list," a list of the amounts of money other inmates owed him.  At a visit with mental health provider Virginia Nesheim in October 2009, Miller reported that he had not experienced auditory hallucinations in years.

Miller was released from Farmington Correctional Center in January 2010, and he moved to Silex Residential Care Facility (SRCF) in Silex, Missouri.  On January 18, 2010, he saw Dr. William Wang for an initial psychiatric evaluation.  Dr. Wang wrote that Miller had a history of psychosis but no present symptoms,

that Miller reported he felt "fine" and "happy," though he was afraid of being in his room alone.  Dr. Wang assigned Miller a GAF of 50.[7]

Miller was evaluated the same week by counselor Martha Metter of Crider Health Center.  At a visit on January 20, 2010, Metter wrote that Miller described the history of his illness in a "disjointed, sketchy way."  He reported not understanding what a diagnosis of paranoid schizophrenia meant.  Metter wrote that, "When explained to him, he reported he 'never heard voices.  Well, maybe I did, I don't know.'"  Metter noted that Miller listed his mother as an emergency contact though she was deceased.  Miller reported wanting to work "anywhere that pays a decent salary" and being able to complete household chores.  He was still taking Risperdal, and was compliant.  Metter noted that Miller had a somewhat difficult time sitting still for the interview, exhibited delayed speech, fleeting to normal eye contact, and appeared confused and very passive.  She wrote that Miller had "severe" problems with daily living skills.

On February 3, 2010, a nurse with SRCF reported that Miller was attending activities, getting along with staff and peers, keeping his doctors' appointments, eating and sleeping well, and walking 30 minutes per day as ordered by medical staff.  On February 9, 2010, Miller met with counselor Wendy Schrader of Crider

---

[7] A GAF of 41 to 50 indicates "serious symptoms" or "any serious impairment in social, occupational, or school functioning (e .g., few friends, unable to keep a job)."  DSM-IV 34.

Health Center. He reported wanting to have a job and discussed his "lack of education" as a barrier to employment. According to Schrader's notes, Miller reported being bored at SRCF and was "glad to be out and about."

Miller continued to meet monthly with either Dr. Wang or psychiatrists Lewis Meyerson or Richard Leahy from February 2010 through May 14, 2011, the date of the last treatment record before the ALJ. The psychiatrists diagnosed Miller with paranoid schizophrenia and cocaine abuse in remission. One doctor reviewed Miller's records and progress each month and completed a "Physician's Orders" form that listed Miller's medications, diagnoses, level of care, and other information. The forms consistently allowed Miller to leave the facility, but only with a responsible party and his medications. Miller took multiple medications for stomach and intestinal problems, but his only mental health-related medications were Risperdal and, occasionally, Ambien. At each visit with Dr. Meyerson, Dr. Wang, or Dr. Leahy, Miller reported that he was "doing fine" and denied hallucinations, paranoia, and suicidal and homicidal ideations.

According to treatment records, Miller was cited for gambling and selling cigarettes and sodas to "lower functioning" residents of SRCF. He was also disciplined for leaving the facility in April 2010 and purchasing alcohol, which – per the terms of his probation – he could not consume. It was confiscated before he drank it. At a visit with counselor Schrader on April 6, 2010, shortly after this

incident, Miller reported that he felt bored.  Schrader noted that Miller "minimized issues related to his behavior" but exhibited normal eye contact and an euthymic mood.  According to treatment notes from Schrader in May 2010, Miller had taken a tour of a different facility but did not want to move there because it was "crowded."  Multiple times, Miller reported needing help with reading tasks, including clothing sizes, nutrition labels, and his mail.

At a visit on June 7, 2010, counselor Schrader wrote that she was "unsure if Client's Psychiatric diagnosis is accurate as he has not exhibited any symptoms related to his diagnosis."  The following month, at a visit on July 16, 2010, counselor Schrader wrote, "Client would like to stop taking his Psych meds as he has not had any hallucinations or delusions 'in twenty years.'"  In August 2010, Schrader described Miller's intellect as "below average."

That same month, Miller reported a headache had made him "excited and tense."  Counselor Schrader wrote that Miller "had limited insight into this or understanding of how to manage his stress."  She noted that he denied any recent psychological symptoms, but that he exhibited fleeting eye contact, rigid posture, and fidgety behavior.

At an appointment on September 28, 2010, counselor Joshua Hall wrote that Miller "discussed how the medications are helping him to be stable" and that Miller would one day like to live and work independently.

At a monthly visit on November 22, 2010, Dr. Wang wrote that Miller was "doing well.  Will go home for holiday with brother."  Miller reported sleeping problems due to his roommate's snoring.  Dr. Wang noted that Miller was in a good mood and had an appropriate appearance and a euthymic affect.  He assigned Miller a GAF of 52.  The next month, on December 15, 2010, Miller saw Dr. Meyerson, who noted that, as usual, Miller had "no complaints per staff."

Beginning in December 2010, a staff person from SRCF completed a "Silex Residential Monthly Summary" for Miller.  According to each summary, Miller was consistently alert and oriented, had a good appetite, was compliant with his medications, and interacted appropriately with others.  The staff person completing the form circled "independent" for how Miller did his activities of daily living.  In December 2010, staff person Katie Hanna noted that Miller had recently begun going to Headway Clubhouse.[8]

On March 5, 2011, Miller saw Crider Health Center counselor Kerry Kirkland, who helped him complete paperwork for Medicaid and his Social Security appeal.  Kirkland noted that Miller was oriented, interactive, and engaged, with coherent speech and logical thought.  She wrote, "Client usually works at Pike

---

[8] According to its website, Headway Clubhouse is an accredited Psychosocial Rehabilitation Program.  It is a "place where people with serious mental illness participate in their own recovery by working and socializing together in a safe and welcoming environment."  Headway offers a "vast array of services, which includes housing supports, advocacy, employment, education, and social opportunities."  *See* "Headway Clubhouse," Crider Health Center, http://www.cridercenter.org/2012-02-27-17-41-29/adult-mental-health-services/headway-clubhouse.

County Recycling in Bowling Green, MO. A van takes him there. He is expecting to start at Earthwise Recycling in Troy this coming Monday and work Monday-Thursdays, but has not heard anything more about this yet." A letter from SRCF administrator Marilyn Webert, dated April 18, 2011, noted that Pike and Earthwise are both sheltered workshops. Webert wrote, "Lionel is working with a case manager to attempt to gain a job in the competitive workforce. Lionel worked at Pike Shop in February 2011. He went on his own and gained employment at another sheltered workshop, Earthwise."

According to a monthly summary from March 5, 2011, Miller was demonstrating occasional inappropriate interactions with others. Staff wrote that he was arguing with staff and needed "to be checked frequently for contraband due to having [history] of bringing in cigarettes and soda which he then sells to other residents." Several days later, on March 8, 2011, Miller saw psychiatric nurse Nan Roberts. He reported that he was doing "pretty good," with good appetite and sleep; however, staff had reported an increase in aggression. Nurse Roberts assigned Miller a GAF of 50.

At an appointment the following week, on March 18, 2011, Miller saw counselor Kirkland, who noted that Miller was smiling and euthymic and demonstrated logical thoughts and normally paced speech. Kirkland wrote, "when asked how work day at Earthwise went, client said it was very busy and is hard

work." Miller saw Kirkland again a few days later. According to Kirkland's treatment notes, Miller "had just reported from work at Earthwise and reported he had a very busy, productive day working on boxes all day." She described him as well-groomed and pleasant, with a broad affect and clear cognitions and speech.

Miller saw Dr. Wang again on April 11, 2011, who noted Miller had possibly been gambling, selling cigarettes, and being argumentative. Miller had undergone cataracts surgery earlier that month. His mental status examination was unremarkable, and he reported adequate sleep and appetite. Dr. Wang increased Miller's prescription of Risperdal to three milligrams per day, explained to Miller the potential risks of the medication, and assigned him a GAF of 52. The Silex monthly summary for April 2011 also noted Miller's habit of selling cigarettes and sodas to other residents. The staff person wrote, "Have had several discussions with him on this problem." A progress note from a doctor's appointment on April 16, 2011 shows that Miller had "no complaints."

The following month, according to the monthly summary, Miller could be argumentative and secretive and did "not like to follow [SRCF's] policies." A staff note from May 10, 2011 indicates that "A 30 day intent to discharge from facility was given to Resident today for not requiring the services of the facility."

## *Function Report*

Miller completed a function report on December 22, 2009, shortly before he was released from Farmington Correctional Center. In that report, Miller wrote that he played cards and dominoes, and watched television. In prison, he could shop once per week, spent time with others, and did art. His ability to engage in leisure activities had not changed because of his conditions. He wrote that he was "pretty good" at getting along with authority figures and handling changes in routine, and all right at handling stress.

Miller reported no problems with personal care or handling money, though he wrote that he used to be able to lift heavy items and was no longer able to do so. Miller reported problems with lifting, understanding, and memory. He could pay attention for thirty minutes, finish what he started, and could follow spoken instructions all right, but he was not very good at following written instructions. Miller wrote, "I don't remember what's happening when medications are not working as well as they should." He reported that he had a learning disorder and "a third grade education if that high."

## *Medical Source Statements*

Dr. Jones was Miller's treating psychiatrist at Farmington Correctional Center from July 2007 to January 2010. In a treatment record from an appointment on August 13, 2009, Dr. Jones wrote, "In my opinion, this offender is unable to be

gainfully employed in any competitive work setting. and is totally disabled.  He should receive SSD/SSI and Medicaid benefits when he is released from the DOC."  He repeated this statement in a letter dated December 18, 2009.

Dr. Wang, one of Miller's treating psychiatrists at SRCF, completed two Medical Source Statements.  On August 5, 2010, Dr. Wang found that Miller had some marked limitations in his activities of daily living, including his ability to cope with normal stress; function independently; and behave in an emotionally stable manner.  Dr. Wang also found that Miller had marked limitations in certain areas of social functioning, including his ability to interact with strangers or the general public and to accept instructions or respond to criticism.  As for concentration, persistence, and pace, Dr. Wang found that Miller had marked limitations in his ability to maintain attention and concentration for extended periods; perform at a consistent pace; and respond to changes in work setting.  Dr. Wang found that Miller had moderate limitations in all other areas of function.  He determined that Miller could only carry out simple instructions and interact appropriately with coworkers, supervisors, and the general public for 0-2 hours per day.  Finally, he found that Miller would be late and/or absent from work three or more times per month due to psychological symptoms.  He repeated his diagnosis of schizophrenia.

In a second Medical Source Statement, completed October 12, 2011, Dr. Wang came to similar conclusions. He found that Miller had only moderate limitations in some areas in which he had previously found marked limitations. He also determined that Miller could interact appropriately with the general public for up to four hours per day.

### *Psychiatric Review Technique*

Nonexamining state psychologist James Spence completed a Psychiatric Review Technique on January 25, 2010, about two months before Miller's alleged onset date. Dr. Spence assessed Miller for the conditions of paranoid schizophrenia and polysubstance abuse, with an assumed onset date of May 1, 2001. Dr. Spence found that Miller had mild limitations affecting his activities of daily living and ability to maintain social functioning; and moderate difficulties in maintaining concentration, persistence, and pace. He found that Miller had no repeated episodes of decompensation of extended duration. Dr. Spence noted that Miller was stable on medication and therapy; attended group therapy without problems; had not experienced hallucinations in several years; had no difficulty with sleep or personal care; and had unremarkable mental status examinations. Ultimately, he concluded, the medical evidence of record showed that Miller "retain[ed] the capability to perform simple repetitive tasks on a regular basis away from the general public."

Dr. Spence also completed a mental residual functional capacity assessment on January 25, 2010. He determined that Miller had moderate limitations in certain areas. Specifically, Spence found that Miller was moderately limited in his ability to remember locations and work-like procedures; understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance and be punctual within customary tolerances; complete a normal workday and workweek at a consistent pace; accept instructions and respond appropriately to criticism from supervisors; respond to changes in work setting; and set realistic goals or make plans independently of others. Dr. Spence determined that Miller had no significant limitations in the other areas of functioning, including the ability to understand and carry out simple routine instructions; make simple work-related decisions; and sustain an ordinary routine without special supervision.

## *Miller's Testimony Before the ALJ*

At the administrative hearing on April 28, 2011, the ALJ noted that Miller's first clean drug drop was not until October 2010. So the ALJ first questioned Miller's attorney about when Miller stopped using drugs. Miller's attorney stated that Miller had not used drugs while incarcerated or since he had been released from prison on January 11, 2010. The attorney stated that Miller lived far away

– 16 –

from the drug-testing facility and was not able to obtain transportation, so his first drug drop after incarceration was not until October 2010. She noted that Miller "reside[d] in a residential care facility with limited access to anything and close monitoring. And he's been there since he's been released." The ALJ responded, "What you have proof of is what you have proof of."

Then the attorney pointed out that Miller's treating mental health providers did not diagnose him with substance abuse. She pointed to a treatment record from March 26, 2010, in which psychiatric nurse Nan Roberts diagnosed Miller with "cocaine abuse in remission." The attorney then asked if she could confer with Miller. The ALJ stated, "I think it makes sense to talk to him about it because even if you don't get a favorable decision you don't want that to be your problem." After a short conference, Miller and his counsel decided to amend the onset date to March 26, 2010.

Afterward, Miller testified about what type of work he did at the sheltered workshop. He stated that he "fill[ed] up bales with recycling like lawnmower[s] and cans and plastic and stuff like that" for about six hours per day. In response to questions from the ALJ, he discussed his wages there. He stated that he had done janitorial work before being incarcerated. While in prison, he worked as a dorm maintenance worker and a dishwasher for two or three hours per day.

Miller testified that Silex Residential Care Facility provided him with food, shelter, medications, and sometimes transportation. He used to have a driver license but had not applied for one because he had problems reading the form. He stated that he had gone to school until eighth grade but only had a third-grade education. He had problems writing and knowing "if [he was] doing it exactly right." He testified that he also had difficulty understanding and following instructions, but that his memory was okay. He stated that he had been meeting with a Crider Center counselor once per week during his time at SRCF, and that the counselor helped him with paperwork, reminders, transportation, and his emotions. When he was not at work, he would be in his room watching television or playing cards.

Miller stated that his incarceration had led him to feel disturbed when there were a lot of people around him making noise. He testified that made him "feel off balance," like he didn't "know what's going on half the time." When that happened, he would go into "a shutdown," not speaking or moving around much.

The ALJ questioned Miller about a treatment note that said "client reports helping other residents with money by allowing them to pawn items to him." Miller testified that one SRCF resident would "go around and he will beg you" to give him money in exchange for some items. According to Miller, "even if you tell him no, he'll insist on you doing something for him and he'll give you a sad

story like his parents don't love [him] and all that." Miller stated that he gave the resident money in exchange for a watch, which he then turned in to a supervisor. He also stated he had lent money to a second resident, and that he had bought a television from a third resident but had to return it because transactions like that were not allowed at the facility.

The ALJ asked Miller how he knew about SRCF and the sheltered workshops. Miller stated that he thought "someone from the institution got me this place to stay." He was not aware that he owed back rent to SRCF.

### *Vocational Expert's Testimony*

Vocational expert Charles McBee also testified before the ALJ. McBee first classified Miller's janitorial work as medium, semi-skilled work. Then he responded to two hypotheticals posed by the ALJ. The hypotheticals were based on the functional limitations determined by treating psychiatrist Dr. Wang and nonexamining state psychologist Dr. Spence, respectively. McBee testified that a person with the functional limitations as characterized by either Dr. Wang or Dr. Spence would not be able to do Miller's past work or any other work.

The ALJ then asked McBee whether a person with the same functional limitations could perform Miller's past work, or any other work, if he were able to work satisfactorily 80 percent of the time. McBee testified that such a person would be able to work, but it "would be at the minimal [level] acceptable in [a]

competitive environment." He stated that working 80 percent of the time meant the person would be off-task a little less than five minutes during each hour. McBee testified that such a person could do Miller's past work of recycler and dishwasher because they had a specific vocational preparation (SVP) level of 2. However, he stated that such a person could not do Miller's past janitorial work because it would have an SVP level of 3.

## III.   Standard for Determining Disability Under the Social Security Act

Social security regulations define disability as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 416(i)(1); 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 404.1505(a); 20 C.F.R. § 416.905(a).

Determining whether a claimant is disabled requires the Commissioner to evaluate the claim based on a five-step procedure. 20 C.F.R. § 404.1520(a), 416.920(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process).

First, the Commissioner must decide whether the claimant is engaging in substantial gainful activity. If so, he is not disabled.

Second, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work activities.  If the impairment is not severe, the claimant is not disabled.

Third, if the claimant has a severe impairment, the Commissioner evaluates whether it meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

Fourth, if the claimant has a severe impairment and the Commissioner cannot make a decision based on the claimant's current work activity or on medical facts alone, the Commissioner determines whether the claimant can perform past relevant work.  If the claimant can perform past relevant work, he is not disabled.

Fifth, if the claimant cannot perform past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national economy.  If not, he is declared disabled.  20 C.F.R. § 404.1520; § 416.920.

## *Evaluation of Mental Impairments*

The Commissioner has supplemented the familiar five-step sequential process for evaluating a claimant's eligibility for benefits with additional regulations dealing specifically with mental impairments.  20 C.F.R. § 404.1520a. As relevant here, the procedure requires an ALJ to determine the degree of

functional loss resulting from a mental impairment. The ALJ considers loss of function in four capacities deemed essential to work. 20 C.F.R. § 404.1520a(c)(2). These capacities are: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) deterioration or decompensation in work or work-like settings. 20 C.F.R. § 404.1520a(c)(3). After considering these areas of function, the ALJ rates limitations in the first three areas as either: none; mild; moderate; marked; or extreme. The degree of limitation in regard to episodes of decompensation is determined by application of a four-point scale: none; one or two; three; or four or more. *See* 20 C.F.R. § 404.1520a(c)(4).

## IV.   **The ALJ's Decision**

Applying the five-step sequential evaluation, the ALJ first determined that Miller had not engaged in substantial gainful activity since November 10, 2009, the date he applied for benefits.

Proceeding to step two, the ALJ found that Miller had severe impairments of a history of polysubstance abuse and paranoid schizophrenia. Though Miller had alleged that he had borderline intellectual functioning, the ALJ found there were no significant, objective medical evidence to support a finding that it was severe. He noted that there were no intellectual test results in the record and that Miller was taking classes while in prison. Although Miller had trouble with reading and writing, that could be attributed to his lack of education. However, the ALJ

pointed out that Miller's residual functional capacity already limited him to simple, unskilled work.

At step three, the ALJ found that Miller's severe paranoid schizophrenia did not meet a listing because he had not reported any delusions or hallucinations in many years and his mental status examinations had all been unremarkable, with no incoherence, loosening of associations, illogical thinking, or poverty of content of speech.

In considering functional limitations as required by the Social Security regulations, the ALJ found that Miller had mild restrictions in his daily activities and social functioning; moderate difficulties with concentration, persistence, and pace; and no episodes of decompensation. In support of these findings, the ALJ noted that Miller was able to think clearly; participate in activities; do chores and his own personal care; and was always appropriately groomed and dressed. He also usually got along with others, including authority figures and some peers. Though Miller reported some problems with understanding and memory, he stated on his 2009 function report that he could handle stress and changes in routine; could follow spoken instructions; and did not exhibit signs of paranoia.

At step four, the ALJ determined that Miller could perform medium work but was limited to simple, unskilled work. The ALJ found that Miller's medically determinable impairments could reasonably be expected to cause his alleged

symptoms, but his "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity."  Among other things, the ALJ noted that Miller was stable on Risperdal; experienced no side effects; had not been hospitalized; usually presented no complaints; had wanted to stop taking his medication; and had not "generally received the type of medical treatment one would expect for a totally disabled individual."

The ALJ rejected Dr. Jones' opinion that Miller was disabled, noting that it was conclusory and inconsistent with other medical evidence of record, as well as Dr. Jones' own treatment notes.

The ALJ gave little weight to Dr. Wang's opinion, reasoning that Dr. Wang only saw Miller four times[9] and his treatment notes were "sparse"; indicated that Miller was doing well; and had unremarkable mental status examinations.  The ALJ commented that the "possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes" or that an "insistent" patient might demand certain opinions.  Though the ALJ acknowledged

---

[9]  Dr. Wang submitted a second medical source statement dated October 12, 2011.  He had seen Miller at least seven times by then.  (*See* Tr., pp. 330, 332, 333, 335, 423, 432, 433.)  The fact that the letter was submitted to the Appeals Council but not to the ALJ does not change this court's standard of review.  *See Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007) ("Where, as here, the Appeals Council considers new evidence but denies review, we must determine whether the ALJ's decision was supported by substantial evidence on the record as a whole, including the new evidence.").

that this was "difficult to confirm," she found it was more likely in cases where a physician's opinion departed substantially from other evidence, such as this case.

The ALJ gave great weight to Dr. Spence's remark that Miller retained some capacity for work and found it consistent with the evidence and Miller's function report describing his activities of daily living. Though Miller later described more limited activities, the ALJ discounted his testimony because it could not be verified and, even if credible, might be attributed to factors other than his conditions.

Finally, at step five, the ALJ found that Miller had no past relevant work but could perform some types of medium work. The ALJ noted that Miller's ability to perform medium work "has been impeded by additional limitations" but he could do simple, unskilled work, including as a dishwasher and recycler.

## V.    Standard of Review

This court's role on review is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole. *Rucker v. Apfel*, 141 F.3d 1256, 1259 (8th Cir. 1998). "Substantial evidence" is less than a preponderance but enough for a reasonable mind to find adequate support for the ALJ's conclusion. *Id.* When substantial evidence exists to support the Commissioner's decision, a court may not reverse simply because evidence also supports a contrary conclusion, *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir.

2005), or because the court would have weighed the evidence differently. *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992).

To determine whether substantial evidence supports the decision, the court must review the administrative record as a whole and consider:

(1) the credibility findings made by the ALJ;

(2) the education, background, work history, and age of the claimant;

(3) the medical evidence from treating and consulting physicians;

(4) the plaintiff's subjective complaints relating to exertional and nonexertional impairments;

(5) any corroboration by third parties of the plaintiff's impairments; and

(6) the testimony of vocational experts, when required, which is based upon a proper hypothetical question.

*Stewart v. Sec'y of Health & Human Servs.*, 957 F.2d 581, 585–86 (8th Cir. 1992).

**VI.** **Discussion**

Miller argues that the ALJ erred by: (1) assigning too little weight to the opinions of his treating psychiatrists; (2) failing to consider how Miller's structured environment reduced his symptoms; (3) failing to sufficiently analyze Miller's borderline intellectual functioning; (4) failing to account for all functional limitations caused by schizophrenia when determining Miller's residual functional capacity; and (5) failing to describe how the evidence supported the ALJ's RFC

determination; and (6) determining that Miller had an RFC not supported by substantial evidence.

I find that although the ALJ properly disregarded the opinions of Miller's treating physicians, the ALJ failed to base her RFC determination on substantial evidence, including "some medical evidence," as required by Social Security regulations. As such, I will remand for proper determination of Miller's RFC, including further development of the record. I will address each of Miller's arguments, but not in the order he raised them.

A.    ***Structured Environment***

The Social Security regulations note that individuals "with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms." 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.00(E)); *see also* § 12.00(F) (structured environments like halfway houses and board and care facilities "may greatly reduce the mental demands placed on" a claimant, minimizing "overt symptoms and signs of the underlying mental disorder" without affecting the claimant's ability to function outside a structured, supportive environment); § 12.00(C)(4) ("Episodes of decompensation may be inferred from medical records showing . . . the need for a more structured psychological support system (e.g., hospitalization, placement in a halfway house, or a highly structured and directly household")).

During the alleged period of disability, Miller lived at the Silex Residential Care Facility, where he was provided with food, shelter, transportation to essential appointments, and medical care, including medications, psychiatric treatment, and a case manager.  He also participated in Headway Clubhouse[10] and worked at two sheltered workshops.  All of these support systems undoubtedly decreased the mental demands placed on Miller and may have ameliorated his symptoms.  He is correct that the mere fact that he was doing well at SRCF does not mean that he could necessarily maintain competitive employment.  However, the fact that he lives in a structured setting does not, by itself, mean that he is disabled.  There is simply no evidence that Miller's mental condition would or would not deteriorate outside a highly structured environment.  *See, e.g., Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) (claimant bears burden of proving RFC). Nonetheless, the significance of the ALJ's finding that there were no episodes of decompensation is somewhat diminished by Miller's living arrangements at SRCF. Upon remand, the ALJ is encouraged to seek evidence of Miller's mental condition outside this highly structured setting.  *See Eichelberger v. Barnhart*, 390 F.3d 584, 592 (8th Cir. 2004) (ALJ has duty to develop record independent of claimant's burden).

---

[10] *See supra*, n.8.

**B.**     *Borderline Intellectual Functioning*

Miller also argues that the ALJ erred by failing to order intellectual testing to confirm or disprove Miller's borderline intellectual functioning.  Even if this were error, it would be harmless.  The ALJ properly accounted for the functional limitations that borderline intellectual functioning would cause by limiting Miller to "simple, unskilled work."  *See Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2007) (ALJ's description of claimant as capable of doing simple, routine, repetitive work "adequately account[ed] for the finding of borderline intellectual functioning").

**C.**     *Residual Functional Capacity*

Miller's remaining arguments all relate to the ALJ's determination of his residual functional capacity.  Specifically, Miller contends that the ALJ failed to accord proper weight to opinions from his treating doctors; failed to account for all of the functional limitations caused by his schizophrenia; failed to include a narrative description of how the evidence supported the RFC determination; and assigned an RFC not supported by substantial evidence.  I find that the ALJ's RFC determination was not supported by substantial evidence, including "some medical evidence" as required, and I will remand on that basis.

The RFC is the most a claimant can do despite the combined effect of all of his credible mental and physical limitations.  *Combs v. Astrue*, 243 Fed. Appx.

200, 203 (8th Cir. 2007); *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004); 20 C.F.R. § 404.1545. It is the claimant's burden to prove his RFC. *Pearsall v. Massanari*, 274 F.3d at 1217.

However, it is the ALJ's responsibility to determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own description of his limitations. *Id.* Ultimately, the determination of residual functional capacity is a medical issue, *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000), which must be supported by "some medical evidence." *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001) (internal quotation marks omitted). To properly support an RFC determination, the ALJ "should obtain medical evidence that addresses the claimant's ability to function in the workplace." *Id.*; see also 20 C.F.R. § 404.1545(c) (RFC is measure of what work a claimant can do "on a regular and continuing basis").

*Opinions of Treating Psychiatrists*

A treating physician's opinions must be given controlling weight if they are well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence. *Renstrom v. Astrue*, 680 F.3d 1057, 1064 (8th Cir. 2012); *see also* 20 C.F.R. § 416.927(c). But because the record must be evaluated as a whole, the Eighth Circuit has cautioned that the opinions of a treating doctor do "not automatically control." *Renstrom*,

680 F.3d at 1064.  After reviewing the record as a whole, an ALJ may discount or disregard a treating physician's opinion if other medical assessments are supported by better or more thorough medical evidence, or where a treating physician gives inconsistent opinions that undermine the credibility of the opinions.  *E.g., Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000).

In this case, two of Miller's treating psychiatrists submitted opinions.  Dr. Jones' opinion consisted of a single statement that Miller was disabled and unable to work.  An unsupported opinion that a claimant cannot work is not entitled to controlling weight.  *See Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005) (treating physician's conclusion that claimant is unable to work is not entitled to controlling weight because that determination is "assigned solely to the discretion of the Commissioner").  Further, Dr. Jones' opinion was inconsistent with his own treatment records, in which he stated that Miller had been doing "very well" in prison and merited a decrease in medication.  Therefore, the ALJ properly disregarded Dr. Jones' opinion.  *See Renstrom*, 680 F.3d at 1064 (ALJ may discount opinion of treating physician who "renders inconsistent opinions that undermine the credibility of such opinions"); *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004) (ALJ may appropriately disregard "vague, conclusory statements" by treating physician).

Dr. Wang completed a medical source statement, checking boxes indicating that Miller had "moderate" or "marked" limitations in each subset of the four areas of functioning. The ALJ gave "little weight" to Dr. Wang's opinion because he had only examined the claimant four times; his treatment notes were "sparse"; he made normal findings on each mental status examination he conducted; and his opinion was not supported by other substantial evidence in the record. For example, Miller did not report hallucinations, paranoia, homicidal or suicidal ideations, side effects from his medication, or virtually any other psychological symptom the entire time he was treated by Dr. Wang.

It is true that, in cases of mental disorders, an ALJ "must take into account evidence indicating that the claimant's true functional ability may be substantially less than the claimant asserts or wishes." *Hutsell v. Massanari*, 259 F.3d 707 (2001). But in addition to Miller's own subjective reports, staff at SRCF consistently reported that Miller was alert and oriented, had a good appetite, and was compliant with his medications. Each time he saw Drs. Wang, Meyerson, or Leahy, the doctor marked "no complaints per staff." Miller's case managers often wrote that he was cooperative, displayed linear and goal-directed thinking, and socialized with others. Given the medical evidence of record, the ALJ gave "good reasons" for disregarding Dr. Wang's medical source statement.

### *Determination of RFC Not Supported by Substantial Evidence*

Even though the ALJ properly disregarded the treating doctors' opinions, the ALJ was required to assign Miller a residual functional capacity supported by substantial evidence.

In *Lauer v. Astrue*, the Eighth Circuit remanded a case where the ALJ had rejected the opinions of the claimant's treating psychiatrist and of a state psychologist who had administered tests to the claimant. 245 F.3d 700, 706 (8th Cir. 2001). The court held that "[e]ven if the ALJ provided ample reasons for his decision not to adopt the opinions of" the physicians, he would still have had to point to medical evidence supporting his RFC determination, yet he had not done so. A mental RFC determination by a nonexamining doctor who had not provided specific medical findings in support of his assessment did not constitute the "substantial evidence" needed to support the ALJ's decision, especially because it contradicted the treating physician's opinion.

Further, because the hypothetical question posed to the *Lauer* vocational expert was "based upon the faulty determination" of the claimant's RFC, the expert's answer to that question also could not constitute substantial evidence. Ultimately, the court concluded that if the ALJ had believed that the professional opinions available to him were insufficient to allow him to form an opinion, he had a duty to develop the record further. *Id.*

In Miller's case, the same problems plague the ALJ's RFC determination. The ALJ discounted the opinions by Miller's two treating psychiatrists, and her reasons for doing so were valid. Nonetheless, the ALJ could not determine Miller's RFC without some medical evidence. She stated that she gave "great weight" to the opinion of Dr. Spence, the nonexamining state psychologist. However, the vocational expert testified that with the limitations assigned by Dr. Spence, a claimant could not work. The ALJ did not address the inconsistency between Dr. Spence's mental RFC findings, which precluded work, and his comment that Miller "retain[ed] the capability to perform simple repetitive tasks on a regular basis away from the general public." Without any discussion, this note cannot, standing alone, constitute the medical evidence needed to support the ALJ's RFC determination – especially when it contradicts his own mental RFC assessment and opinions by both of Miller's treating psychiatrists.[11]

Further, looking at the record as a whole, treatment records from Drs. Jones and Wang, or any of Miller's other mental health providers, do not support Miller's capacity to sustain competitive employment, especially where no treating mental health professional opined that Miller could work. *See* 20 C.F.R. §§ 404.1512(b)(1), 404.1528(b) (medical evidence includes treatment records).

---

[11] Additionally, the psychiatric review technique and mental RFC assessment were completed by Dr. Spence before the amended onset date and, more importantly, before Dr. Spence could have accessed any medical records from SRCF or Crider Center.

Though records showed that Miller often had no complaints, he was in a highly structured environment where meals, shelter, medications, regular psychiatric care, case management, essential transportation, help with reading tasks, social opportunities, and even a type of meaningful work were provided to him by others. *See Hutsell v. Massanari,* 259 F.3d 707, 712 (8th Cir. 2001) (ALJ "relied too heavily on indications in the medical record that [the claimant] was 'doing well,' because doing well for the purposes of a treatment program has no necessary relation to a claimant's ability to work or to her work-related functional capacity"); *see also Pate–Fires v. Astrue,* 564 F.3d 935, 943 (8th Cir. 2009) (treating physician's notes that a mental disorder is in remission with medication and management therapy did not indicate that the claimant was stable enough to return to work).

Though Miller expressed a desire to work, multiple mental health providers recognized that Miller had poor understanding of his own functional limitations. (*See* Tr., p. 214, 253, 285, 389; *see also* Tr., p. 424 (though Miller reports doing "pretty good," staff reports increased aggression)). The ALJ should have obtained "medical evidence that addresses the claimant's ability to function in the workplace" rather than relying on Dr. Spence's contradictory statement.

Also like *Lauer*, the ALJ's last hypothetical question in this case appears to have been faulty. After the vocational expert's testimony that the limitations

assigned either by Dr. Wang or by Dr. Spence would preclude competitive

employment, the ALJ changed the hypothetical as follows:

> ALJ: . . . Now I am going to ask a third hypothetical. And that is if [a claimant] could [retain the ability to perform work] satisfactorily 80 percent of the time. Could he do past work or other work?

> VE: Yes, your honor. If an individual were to be able to do it at least 80 percent of a workday, that would be at the minimal acceptable in competitive employment.

This is the only question the ALJ posed to the expert that yielded a response

supporting her finding that Miller could work. There is no indication that Dr.

Spence, Dr. Wang, Dr. Jones, or any other health provider opined that Miller could

succeed in a competitive work environment 80 percent of the time. It is unclear

where this figure comes from. Miller had testified that he worked from 8 a.m. until

1:45 p.m. at the Pike Recycling sheltered workshop, but this represents a shorter

shift than 80 percent of an eight-hour work day. (*See* Tr., p. 49 (vocational expert

testified that 80 percent of an eight-hour day is 7.24 hours, or "being off-task no

more than approximately five minutes out of every hour")). Because this

hypothetical question was not based on any medical evidence, it cannot constitute

substantial evidence supporting the ALJ's RFC determination.

## VII.  Conclusion

In sum, the ALJ's determination of Miller's RFC is not supported by

substantial evidence, including "some medical evidence" as required.

Additionally, the ALJ failed to properly develop the record by not obtaining necessary medical evidence addressing plaintiff's physical ability to function in the workplace.

I will therefore reverse and remand in order for the ALJ to formulate a new mental residual functional capacity for plaintiff, based on the medical evidence in the record and to order additional medical information addressing plaintiff's ability to function in the workplace. Reevaluating Miller's RFC on remand may require the ALJ to contact Miller's treating sources, which may, in turn, require a reassessment of the weight owed to their opinions.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is reversed and remanded to the Commissioner under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum and Order.

A separate judgment in accordance with this Memorandum and Order is entered this same date.

_Catherine D Perry_
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 27th day of August, 2013.